[Dkt. Ent. 1]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

SYLVANIA LASSITER,

    Plaintiff,

       v.

COMMISIONER OF SOCIAL SECURITY,

    Defendant.

Civil No. 14-6127 (RMB)

**OPINION**

**BUMB,** District Judge:

Plaintiff Sylvania Lassiter (the "Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 1383(c)(3) of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for supplemental security income under Title XVI of the Social Security Act.  For the reasons set forth below, the Court **VACATES** the Administrative Law Judge's decision and **REMANDS** for further proceedings consistent with this Opinion.

I.    **BACKGROUND**

   A. **Procedural Background**

On August 19, 2009 Plaintiff filed an application for Supplemental Security Income ("SSI") benefits, which was initially denied on April 28, 2012, and denied upon reconsideration on August 4, 2010.  (Administrative Record "R."

1

at 19, 105, 140, 147.)  Because no request for appeal was filed,
Plaintiff's disability status was thereby adjudicated through
the date of the denial, April 28, 2012.  (Id. at 19, 105, 140.)
Thereafter, Plaintiff protectively filed a second application
for SSI benefits on February 16, 2011, alleging an onset date of
September 1, 1998.  (Id. at 19.)  The claim was denied on June
29, 2011 and denied again upon reconsideration on December 5,
2011.  (Id. at 19, 119, 120, 150, 156.)  Plaintiff then
requested a hearing before an Administrative Law Judge ("ALJ")
on December 28, 2011.  (Id. at 158.)  Prior to a hearing before
ALJ Frederick Timm, the claim was selected for an informal
remand initiative before the State Agency, which determined a
fully favorable decision could be issued, with an onset date of
April 12, 2010.  (Id. at 566.)

     In light of the fully favorable determination by the State
Agency, the ALJ dismissed Plaintiff's request for a hearing on
April 12, 2012.  (Id. at 135.)  However, presumably unbeknownst
to the ALJ, the day before, the Office of Quality Performance
determined that the State Agency's proposed onset date as
determined on informal remand overlapped with an already
adjudicated period of non-disability in Plaintiff's first
application, which was able to be reopened.  (Id. at 419.)  This
rendered the fully favorable decision of the State Agency not,
in fact, fully favorable, and the remand decision should have

2

been found to be non-determinative.  (Id. at 419 ("The case
should have been [No Determination] because [the State Agency]
set an unfavorable onset.").[1]  It now appearing that the
dismissal of Plaintiff's request for a hearing before the ALJ on
her second application was wrongly dismissed, the ALJ vacated
his prior order and set the matter for hearing.  (Id. at 136.)

The ALJ conducted a hearing on July 23, 2012.  (Id. at 47-
59.)  Although Plaintiff's first application was capable of
being reopened, (Id. at 61, 418), Plaintiff—represented by
counsel—agreed at the hearing to instead amend the alleged onset
date of the second application to April 12, 2010, which allowed
the hearing to proceed on the merits without addressing the
reopening of her first application. (Id. at 54, 61-62; see also
id. at 37).  The ALJ then indicated it was his intention to
simply rely upon the substance of the procedurally defective
State Agency informal remand determination and find that
Plaintiff was disabled as of April 12, 2010.  (Id. at 57.)[2]

---

[1] In other words, the procedural problem of the informal
remand determination rendered it defective and the case
proceeded as if the informal remand had never happened.

[2] The ALJ explained the posture as follows: "So my best
understanding is – of where we are is this, Ms. Lassiter, that
the State Agency, when your case was sent back down or taken
back down, took an action that they were not authorized to take,
as far as this onset date of April 12th, 2010.  But I believe
that I do have authority to find disability beginning that date,
and it's my intention to do so unless we review the case here
and see that there's something that I'm missing and that it

3

Before the hearing was concluded, however, the ALJ took brief testimony concerning Plaintiff's daily activities since the amended alleged onset date of April 12, 2010.  (R. 54-56.) Significantly, the ALJ asked Plaintiff if her counselor's statement that she had not been incarcerated, (Id. at 52), was correct.  (Id. at 54.)  Plaintiff responded "Yes."  (Id. at 54.)

After the July 23, 2012 hearing concluded, the ALJ discovered that Plaintiff had, in fact, been incarcerated after April 12, 2010.  (Id. at 61.)   Upon discovering this, the ALJ became concerned "about [Plaintiff's] credibility generally and I felt the need to conduct a full hearing on the merits," rather than to simply adopt the findings of the State Agency informal remand.  (Id.)  Accordingly, on November 1, 2012, Plaintiff appeared before the ALJ for a supplemental hearing on the denial of her second application for SSI benefits.  (Id. at 59-104.)

On December 11, 2012, Plaintiff received the decision of the ALJ which found that she was not under a disability as defined by the Social Security Act at any point.  (Id. at 38.) On February 8, 2013 Plaintiff filed a request for review of the ALJ's decision, which was denied by the Appeals Council on July 30, 2014.  (Id. at 1-13.)  Plaintiff now appeals the decision of the ALJ to this Court.

---

requires further discussion or testimony, in which case I'd have to ask you back in."  (R. at 57.)

B. **Factual Background**

Plaintiff was 47 years old, which is defined as a "younger person" under the regulations, 20 C.F.R. § 404.1563, on the alleged disability onset date of April 12, 2010.  In Plaintiff's disability report, she indicated that she suffers from bipolar disorder, hypertension, ganglion cysts, goiter, cocaine dependence, and a foot injury.  (Id. at 293.)  Plaintiff explained her situation in that report, "I cannot work because I cannot function.  I am too depressed to work."  (Id. at 293.)

In her personal life, Plaintiff testified before the ALJ that she is able to carry out very basic cleaning and laundry duties in her household.  (Id. at 74.)  Plaintiff spends most days in her room watching television.  (Id. at 76.)  She is able to typically focus on the television for about an hour at a time.  (Id. at 77.)  Plaintiff often becomes depressed and will take sleeping pills to cope.  (Id. at 78.)  Plaintiff limits her interactions with others, stating that she prefers to be alone. (Id. at 288.)  Plaintiff does, however, interact with family members on a regular basis and talks on the phone daily.  (Id. at 305.)

Finally, Plaintiff is a smoker, who currently uses electronic cigarettes as part of an attempt to quit.  (Id. at 81.)  Plaintiff testified as a part of her hearing before the

5

ALJ that she has a history of substance abuse, although it is largely in remission.  (Id. at 79.)

C. **Medical Evidence**

Plaintiff has been treated by a number of professionals for both physical and mental health issues.  Plaintiff's treatment and assessment history can be divided most clearly into three portions: (1) the treatment she received for a broken ankle in 2009 and 2010; (2) her mental health treatment at Family Service of Mount Holly; and (3) other treatment and assessment of Plaintiff, most frequently as conducted in relation to her applications for SSI benefits.

i.    **Treatment for Fractured Ankle**

Plaintiff suffered a left ankle sprain with distal fibular fracture on or around December 26, 2009.  (Id. at 430.) Plaintiff thereafter saw Dr. Gerald Hayken of Burlington County Orthopaedic Specialists.  (Id. at 451.)  On December 28, 2009, Plaintiff was placed in a weight-bearing cast and was prescribed Percocet.  (Id.)  On January 11, 2010, Plaintiff was able to bear weight on her ankle and a new x-ray showed that the fracture was healing satisfactorily.  (Id. at 449.)  At another follow-up February 8, 2010, Plaintiff's cast was removed and a new x-ray showed the fracture continued to heal.  (Id. at 448.) Plaintiff complained of pain on February 17, 2010 during her next appointment with Dr. Hayken.  (Id.)  Dr. Hayken opined that

6

this pain may be due to post-cast stiffness.  (Id.)
Nevertheless, Plaintiff was walking unassisted.  (Id.)[3]

### ii.  Treatment at Twin Oaks Community Services/Family Service of Mount Holly

The majority of Plaintiff's mental health treatment has taken place at Family Service of Mount Holly ("Family Services"), subsequently renamed Twin Oaks Community Services ("Twin Oaks") during Plaintiff's treatment.  (Id. at 634.)

Plaintiff's treatment began with an initial biophysical assessment at Family Service conducted on April 12, 2010.  (Id. at 533.)  The purpose for the initial visit appears to be part of Plaintiff's attempt to seek substance abuse treatment.  (Id. at 537.)  At that time, Plaintiff presented with a pleasant, but depressed affect.  (Id. at 537.)  Plaintiff also exhibited problems with compliance with her pre-existing subscribed medications.  (Id. at 545.)  Plaintiff's preliminary diagnoses were bipolar disorder, depression, and cocaine abuse (in remission.)  (Id. at 550.)  Her GAF score was 50.[4]  (Id.)

---

[3] In an internal medicine consultative evaluation conducted by Dr. Ken Klausman on behalf of the New Jersey Department of Labor Division of Disability Determination Services on April 8, 2010, Plaintiff was noticed walking with a slight limp favoring her left lower extremity.  (R. at 459.)  He also observed that her left ankle had 40% range of motion, while the right ankle had full range of motion.  (Id.)  Dr. Klausman, however, noted that Plaintiff was able to get on and off of the examining table without difficulty.  (Id.)

[4] A GAF score, or Global Assessment Functioning score, "is a scale used by the American Psychiatric Association to evaluate

After her first visit, the record contains a series of notes from regular visits to Family Service.  On April 29, 2010, Nurse Practitioner Tieshau Middlebrooks saw Plaintiff and completed an Initial Comprehensive Psychiatric Assessment.  (Id. at 501.)  In that assessment, Ms. Middlebrooks noted that two weeks prior to the visit, Plaintiff used cocaine.  (Id. at 502.)  Plaintiff was non-compliant with her medication since May 2009.  (Id. at 502, 503.)  Plaintiff did, however, present with good eye contact, a "neat and clean" appearance, and a calm and cooperative demeanor.[5]  (Id. at 508.) Plaintiff's self-reported mood was depressed, with sleep disturbances and a fluctuating

---

mental disorders," Marti v. Comm'r of Soc. Sec., 2015 WL 4716122, at *5 n.4 (D.N.J. Aug. 6, 2015), and is a "snapshot of a person's functioning." Logan v. Colvin, Civ. No. 14-0571, 2015 WL 5722391, at *8 (D.N.J. Sep. 29, 2015).  Pursuant to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, a GAF score of 50 indicates "serious symptoms," while a GAF score of 51-60 indicates "moderate symptoms."  D'Armi v. Comm'r of Soc. Sec., 2015 WL 4615822, at *5 & n.4 (D.N.J. July 31, 2015).  Notably, the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders has done away with the GAF score "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  DSM-V 16 (5th Ed. 2013).  "In response, the Social Security Administration now allows ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders; however, a 'GAF score is never dispositive of impairment severity," and thus an ALJ should not give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence.'"  Thackara v. Colvin, Civ. No. 14-00158, 2015 WL 1295956 (M.D. Pa. Mar. 23, 2015) (quoting SSA AM-13066 at (July 13, 2013)).

[5] Despite these notes, Ms. Middlebrooks also described Plaintiff as anxious, worried and troubled.  (R. at 508.)

appetite.  (Id. at 509.)  Plaintiff exhibited fair judgment but
felt socially isolated.  (Id. at 511.)  Her concentration was
impaired.  (Id. at 511.)  Ultimately, along with cocaine
dependence, Plaintiff was diagnosed with bipolar disorder,
hypertension, and depression.  (Id. at 513.)  Her GAF score was
50.  (Id. at 513.)

Dr. McFadden of Family Service completed a mental
evaluation of Plaintiff on June 25, 2010.[6]  (Id. at 496.)
Plaintiff's mood was indicated as "so-so" but reactive.  (Id.)
Her insight was poor and her GAF score was, again, 50.  (Id.)
Dr. McFadden also noted that Plaintiff had been out of
medication for two weeks and compliance with her treatment
regimen was a "chronic problem."  (Id.)  Plaintiff admitted she
was disinterested in the programs she had been attending.  (Id.)
Plaintiff also admitted to using cocaine and alcohol during the
week leading up to the appointment.  (Id.)  Plaintiff was
counseled about the importance of maintaining compliance and
told that her failure to comply was contributing to her
condition.  (Id. at 498.)

On March 18 and 29, 2011, Plaintiff again saw Ms.
Middlebrooks.  During the March 29, 2011 evaluation, Ms.
Middlebrooks indicated that it was her opinion Plaintiff was

---

[6] The handwritten evaluation does not reveal Dr. McFadden's
first name or title.  (R. at 498.)

unable to work even part-time.  (Id. at 591.)  Ms. Middlebrooks indicated that the length of the disability was more than 90 days but less than six months.  (Id.)

On April 28, 2011, Plaintiff was again seen at Family Services, where Plaintiff's mental status examination appeared normal or healthy except for a depressed mood.  (Id. at 553.)  A May 26, 2011 evaluation by Family Service began to show improvement, indicating that Plaintiff's mood was "happy" and her GAF score was 60.  (Id. at 635.)  It also notes that plaintiff was sleeping and feeling "much better."  Nevertheless, Plaintiff was still only sleeping for four to five hours per night.  (Id.)

During another fifteen-minute appointment on June 2, 2011, Plaintiff indicated that she had not begun a new medication she was instructed to begin.  (Id. at 638.)  Despite not beginning her treatment, Plaintiff's mood was listed as happy and all other mental status examinations turned back positive or normal results.  (Id.)  Her GAF score was 60.  (Id.)  A June 16, 2011 follow-up appointment seemed much the same, and Plaintiff was feeling "much improved."  Her GAF score was the same.[7]  (Id. at 641.) Another follow-up on July 7, 2011, however, noted

---

[7] The assessment also notes that Plaintiff has no primary care provider, nor does she have Medicaid.  (R. at 643.)

Plaintiff's mood as depressed.  Her GAF score remained at 60.
(Id. at 644.)

Ms. Middlebrooks again evaluated Plaintiff on August 8,
2011.  Plaintiff reported that she recently went on vacation and
while away ran out of her medications.  (Id. at 647.)  She was
non-compliant with her medications for over a month.  (Id.)
Plaintiff reported that her moods were unstable and that she
"went off on her boyfriend and choked him."  (Id.)  Plaintiff
also reported feeling upset and having "racing thoughts."  (Id.)
Ms. Middlebrooks adjusted Plaintiff's medication.  (Id. at 649.)

Over a month later, on September 8, 2011, Plaintiff was
assessed by Dr. Jeff Bolger as being "very anxious."  (Id. at
650.)  Plaintiff reported that she had twenty days of the
medication Depakote left, but there was a potential she would
have to cease taking it after that because of the cost.  (Id. at
650.)  While Plaintiff's mood was "fine," she also constantly
shook her leg.  (Id.)  Plaintiff's GAF score was 60.  (Id.)

Plaintiff returned for a follow-up on October 6, 2011.  At
that meeting, the shaking of her left leg was again noted, and
Plaintiff's mood was "hyper."  (Id. at 655.)  Plaintiff felt
manic and had not been sleeping well.  (Id. at 655.)  As
Plaintiff had projected, she ran out of Depakote.  (Id. at 655.)
Plaintiff's GAF score was 59.  (Id.)  Plaintiff was instructed
to start taking Lithium.  (Id. at 657.)  Two weeks later, on

11

October 20, 2011, Plaintiff reported that she ceased taking the Lithium four days after beginning it.  (Id. at 658.)  Plaintiff continued having trouble sleeping at night and had a decreased appetite, but remarked that her mood was "OK."  (Id.)  Her GAF score held steady at 59.  (Id.)  Plaintiff's medications were adjusted to include Sinequan and Abilify.  (Id. at 660.)

Plaintiff's December 1, 2011 appointment appeared to show improvement of Plaintiff's condition since beginning Sinequan and Abilify.  Her appetite and sleeping were improved.  (Id. at 661.)  Her anxiety was improved.  (Id.)  Upon taking Abilify, Plaintiff reported possible constipation and that the medicine made her tired.  (Id. at 661.)  Her mood was "stable."  (Id.)  Her GAF score was 59.  (Id.)  Plaintiff's January 12, 2012 appointment was substantially the same, although Plaintiff noted anxiety due to an upcoming court date.  (Id. at 664.)  Plaintiff denied episodes of mania or depression.  (Id.)

Plaintiff's next appointment on March 8, 2012 saw her complaining of feeling anxious again.  (Id. at 667.)  Plaintiff was incarcerated during the intervening time between appointments and had been off Sinequan while in prison.  (Id. at 667.)  Her sleeping troubles returned.  (Id. at 667.)  Plaintiff's GAF score was 53.  (Id. at 667.)  Dr. Bolger decreased Plaintiff's dosage of Sinequan so that Plaintiff could afford the medication.  (Id. at 669.)

On April 12, 2012, Plaintiff's mood was good, along with her sleep habits.  Plaintiff offered "no complaints today." (Id. at 670.)  Dr. Bolger noted that Plaintiff was "more interested in going out to smoke than talking."  (Id.) Plaintiff's GAF score rose to 56.  (Id.)  Notes completed along with Plaintiff's evaluation explained that Plaintiff had been seeking early refills of Klonopin.  The staff member suspected Plaintiff was selling or hoarding them.  (Id. at 671.)  Dr. Bolger explained that prescriptions could not be filled early and if she abused the medications, he would discontinue the Klonopin.  (Id.)

In the most recent evaluation of Plaintiff on May 24, 2012, Dr. Bolger reported that Plaintiff had been recently treated at Lourdes Hospital for shortness of breath.  Dr. Bolger noted that Plaintiff's mood appeared to be "good."  (Id. at 673.) Plaintiff reported she was doing "OK" psychologically and was sleeping well.  (Id. at 673.)  Her GAF score rose again to 57. (Id.)

### iii. **Other Treatment and Assessment of Plaintiff**

Dating back to before Plaintiff's alleged onset of disability and overlapping with her treatment at Twin Oaks/Family Services, Plaintiff was also seen or assessed by other medical professionals, often in connection with her applications for SSI.

On March 17, 2010, Plaintiff was examined by Theodore Brown, Jr., Ph.D., for mental health issues as part of a consultative examination in connection with Plaintiff's first application for SSI benefits. (Id. at 452.)  Plaintiff alleged disability due to bipolar disorder, HTN, ganglion cyst, goiter, and foot injury. (Id.)  The report prepared by Dr. Brown indicated Plaintiff had a history of mental illness, including having been sexually molested from age 10 to 16. (Id. at 453.)  Plaintiff complained that she suffers from depression, fluctuating energy levels, mood swings, poor concentration and focus. (Id.)  Dr. Brown noted that Plaintiff was pleasant and cooperative throughout the examination and her hygiene, gait, motor behavior, and eye contact were normal/appropriate. (Id.)  After conducting a number of psychological tests, Dr. Brown noted that the evaluation was consistent with the following diagnoses: bipolar disorder, crack cocaine dependency disorder (in remission), pain disorder, antisocial personality disorder, and ankle pain. (Id. at 454-55.)  Dr. Brown assessed Plaintiff's GAF score at 50 to 55.  Dr. Brown's prognosis was guarded, and "very much contingent upon Claimant receiving appropriate mental health care and treatment . . . ." (Id. at 455.)

At the request of the Social Security Administration, and also in connection with her initial application for SSI

benefits, Plaintiff was evaluated by Dr. Ken Klausman on April 8, 2010.  (Id. at 458.)  Plaintiff exhibited high blood pressure.  (Id.)  She also exhibited a slight limp, but was able to get on and off of the examining table without assistance. (Id. at 459.)  Plaintiff's near vision was 20/200 for the right eye, left eye unable, and 20/100 using both eyes.  (Id.) Plaintiff had a hacking cough.  (Id.)  Plaintiff was alert and oriented.  (Id.)  She knew the President of the United States. (Id.)  She was unable to spell the word "world" backwards and counted backward from 100 by 3's with four errors.  She was able to register three out of three words and recall one of them. (Id.)

On April 15, 2010, Plaintiff's mental health was evaluated by Dr. Joan Joynson for purposes of a psychiatric evaluation and Mental Residual Functional Capacity ("Mental RFC") assessment. (R. 462-474.)  In her assessment, Dr. Joynson determined Plaintiff suffered from pain disorder, bipolar disorder, antisocial personality disorder, and cocaine dependence.  (Id. at 462-471.)  Dr. Joynson determined that Plaintiff's restriction of activities of daily living and social functions were mildly limited.  Plaintiff's difficulties in concentration, persistence or pace were moderately limited.  No episodes of decompensation were found.  (Id. at 472.)  In her Mental RFC,

(Id. at 476-478), Dr. Joynson found Plaintiff was moderately limited in the following areas:

- The ability to understand and remember detailed instructions;

- The ability to carry our detailed instructions;

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- The ability to accept instructions and respond appropriately to criticism from supervisors;

- The ability to respond appropriately to changes in the work setting;

- The ability to set realistic goals or make plans independently of others.

(Id. at 477.)  The narrative description of Dr. Joynson's findings indicate that plaintiff could sustain the rigors of simple work and could learn, retain, and follow simple instructions, while responding adequately to supervision, coworkers and workplace changes.  (Id. at 478.)  The narrative also expresses some doubt about Plaintiff's depressive state, based on her "pleasant and cooperative mood" and "normal motor behavior with a labile mood."  (Id.)

Plaintiff was also evaluated for a determination of her Physical RFC on April 16, 2010.  In that evaluation, her primary diagnoses were a fracture in her ankle and hypertension.  (Id. at 482 (other alleged impairments included a ganglion cyst and

goiter).)  The medical consultant, Jyosthna Shastry, found
claimants symptoms of inability to walk long distances credible.
(Id. at 485.)  The RFC assessment determined that Plaintiff
could occasionally lift 50 pounds, frequently lift 25 pounds,
could stand or walk for a total of two-hours in an eight-hour
work day, and could sit for 6 hours.  She had no restriction on
pushing or pulling.  (Id. at 481.)  Plaintiff's hypertension
diagnosis was not functionally limiting.  For workplace
limitations, Plaintiff was limited to climbing ramps/stairs
sometimes and ladders/ropes/scaffolds never.  (Id. at 482.)
Plaintiff, due to her eyesight, was also limited to working in
close quarters and never performing work that requires binocular
vision.  (Id. at 483.)

On May 7, 2010, Plaintiff was evaluated by Dr. Marie Louis
of Cooper University Hospital.  (Id. at 488.)  The stated
problem was back pain, sweating, sleep problems, and
hypertension.  (Id. at 488.)  Dr. Louis recommended that
Plaintiff seek out physical therapy, but Plaintiff was unsure if
her insurance would cover it.  (Id. at 490.)  It was observed
that Plaintiff was "well-developed, well-nourished, and in no
distress."  (Id. at 493.)

In early February 2011, Plaintiff was treated at Lourdes
Medical Center after a suicide attempt.  (Id. at 519.)
Plaintiff's admitting diagnoses were bipolar disorder,

depression and cocaine abuse.  After a high blood-pressure
reading upon admission, Plaintiff's blood pressure was
hypotensive thereafter.  (Id. at 521.)  Plaintiff's GAF score
upon admission was 25 and upon discharge on February 10, 2011
was 55.  (Id. at 519.)  The record notes that the patient was
non-compliant with her family physician treatment.  (Id. at
521.)

For purposes of Plaintiff's second application for SSI
benefits, Dr. Victoria Miller of Cherry Hill Examiners completed
a consultative psychological examination on November 15, 2011.
(Id. at 563.)  Plaintiff was notably anxious during the
examination and bounced her knee throughout.  (Id. at 564.)
Plaintiff was diagnosed with major depressive disorder with
psychotic features, cocaine dependence (in remission), and
hypertension.  Her GAF score was 50.  (Id.)  Dr. Miller opined
that Plaintiff was below average intelligence and her anxiety
may inhibit her problem solving ability.  (Id.)  Plaintiff's
prognosis was guarded.  (Id. at 565.)  Plaintiff was also deemed
to be unable to manage benefits and would require support in her
own best interest for management of finances.  (Id.)

On June 22, 2011, South Jersey Psychology, through Dr.
William Coffey, conducted a consultative mental status exam.
(Id. at 557.)  This evaluation largely detailed Plaintiff's
mental health treatment, previous suicide attempts, general

18

health status, legal status, and living situation.  (Id. at 557-559.)  Plaintiff presented in a normal fashion for many traits, (Id. at 560 (normal posture, mannerisms, psychomotor activity, gait, affect)), but Plaintiff had trouble remembering objects after five minutes.  (Id.)  The assessment of the severity of her condition noted that "Ms. Lassiter has adequate understanding and memory but limited concentration.  Ms. Lassiter has impaired mental pace and persistence.  Social interaction is impaired."  (Id. at 560.)  Plaintiff's condition was expected to last the next twelve months.  (Id.)  Ultimately, Plaintiff was diagnosed as having cocaine dependence, major depressive disorder, and hypertension.  (Id. at 561.)  Her GAF score was 55.  (Id.)

A subsequent Mental RFC assessment of Plaintiff for April 12, 2010 to present by Dr. David Biscardi (completed on March 27, 2012) determined that Plaintiff was moderately restricted in the activities of daily living, had moderate difficulty in maintaining social functioning, and had marked difficulties in maintaining concentration, persistence or pace.  (Id. at 577.)  Dr. Charles Lawrence agreed with this.  (Id. at 584.)

A June 27, 2011 psychological case analysis by Sharon Flaherty was also conducted.  Plaintiff was found to be markedly limited in her ability to carry out detailed instructions and her ability to interact with the general public.  (Id. at 115.)

Plaintiff was found to be moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to accept instructions and respond appropriately to criticism from supervisors.  (Id. at 115.)  The Plaintiff was found not to be able to work with the public or deal with irate individuals.  (Id. at 116.) Within those limits, Plaintiff was able to sustain memory, concentration, focus, basic social interaction and mental pace. (Id. at 116.)  Plaintiff could understand and follow 3-step instructions.  (Id. at 115.)  This consultative examination was affirmed by another psychological consultant on December 5, 2011.  (Id. at 132.)

On March 13, 2012, the adjudicator of Plaintiff's social security benefits case determined that an onset date of August 19, 2009 would be fully favorable to Plaintiff.  (Id. at 566.) Ultimately, the adjudicator determined that, "The claimant has a long history of depression and personality disorder.  She exhibits significant limitations in her ability to concentrate, focus and persist.  She would be unable to sustain the

performance of even 1-3 step tasks or complete a normal workweek without interruption from psychologically based symptoms." (Id. at 568.)

**D. Testimony before the ALJ**

At the July 23, 2012 hearing, Plaintiff testified that she has held several jobs. After her alleged onset date, Plaintiff was briefly employed at the Cheesecake Factor through a temp agency. However, the work there ended after two months because Plaintiff could not stand long enough to complete an entire shift and began "getting paranoid." (Id. at 52, 54.) Plaintiff also testified that she previously worked in 2005 for Annie's Pretzels as a cashier. (Id. at 67.) She testified that she became too depressed to appear for work consistently and had trouble working with the people there, so she stopped going. (Id. at 67, 68.) Plaintiff later testified that her mental health issues would cause her to become suspicious and paranoid of co-workers from the Middle East. (Id. at 75.) Other than a brief stint working at Mother's Kitchen, (Id. at 342), Plaintiff testified that she could recall no other significant jobs in her employment history. (Id. at 68.) Plaintiff testified that one reason she has not secured a job is because her mood is mercurial. (Id. at 72 ("Q: And you did mention some job counseling. Have you applied for any jobs or tried to get any of these jobs? A: Well, he, he, he said I don't meet the

criteria because like my attitude, like one minute I'm this way
and -- but that all comes with the mental illness.")

Plaintiff also testified about a number of symptoms that
impact her in everyday life.  Plaintiff testified that she has
trouble remembering obligations, so she makes use of a large
calendar to help remember.  (Id. at 79.)  Apart from group
therapy, Plaintiff testified she rarely leaves her home.  (Id.
at 74.)  She testified that when she is in public, she tends to
become paranoid.  (Id. at 74.)  Plaintiff discussed sleep
problems.  (Id. at 78-79.)

Plaintiff also testified about her medical diagnoses.  She
testified that she has high blood pressure, COPD and shortness
of breath.  (Id. at 81.)  Plaintiff has been prescribed several
medications in dealing with these conditions, including—among
others—prednisone, hydrochlorothiazide, clonazepam, Paxil, and
antibiotics.  (Id. at 83-85.)

The ALJ also heard testimony from a vocational expert
("VE").  The VE, under a set of hypothetical constraints by the
ALJ, testified concerning available jobs.  The VE noted that the
proposed limitations allowed for a job as a sorter and mail
clerk.  The VE noted that such jobs were available in the
proposed areas (Burlington and Camden counties and the
Philadelphia area).  Specifically, the VE testified that about
3,500 sorter jobs would be available (including erosion based on

22

specific job requirements) and 4,000 mail clerk jobs (including erosion.)  (Id. at 101.)  The VE testified that these were just several examples of positions available.  (Id. at 101.)

E. **The ALJ's Opinion**

After laying out the procedural history of the claim, the ALJ reached the merits of Plaintiff's request for SSI benefits, applying the usual five-step analysis.

At Step One, the ALJ determined that Plaintiff had no past relevant work and there was no indication that she had engaged in substantial gainful activity at any time since the alleged onset date.  As such, Plaintiff met the requirements of Step One.  (Id. at 21.)  At Step Two, the ALJ determined that Plaintiff had the following severe impairments: (1) an ankle fracture, (2) chronic obstructive pulmonary disorder (COPD), (3) hypertension, and (4) bipolar disorder.  (Id.)[8]  At Step Three, the ALJ determined that none of these conditions met any listing requirement described in Appendix 1. (Id. at 22.)  Having determined that Plaintiff's impairments did not individually or jointly meet the listing requirements, the ALJ looked to

---

[8] Although Plaintiff has a history of cocaine use and has been frequently characterized as cocaine dependent (in remission), the ALJ found that Plaintiff's substance abuse was not a significant factor "material to the finding of disability."  (R. at 22.)

Plaintiff's Residual Functional Capacity ("RFC") to facilitate the analysis.

In assessing Plaintiff's RFC, the ALJ reviewed Plaintiff's voluminous medical treatment history comprising the record.  In so doing, the ALJ assigned weight to medical evidence. Regarding the evaluations of Dr. Joynson, Dr. Klausman and Jyosthna Shastra, the ALJ assigned some weight, but not full weight, because they were based mainly on medical records prior to the alleged onset date.[9]  (Id. at 25.)  The ALJ largely found the medical records associated with Plaintiff's suicide attempt immaterial, as Plaintiff was hypotensive after initial hypertension.  (Id. at 25.)  The ALJ noted that the records concerning Plaintiff's COPD indicated she did not receive treatment for any symptoms until April 27, 2012.  (Id. at 26.) The ALJ gave little weight to Plaintiff's GAF score of 50 as taken on June 25, 2010 because it was inconsistent with other GAF scores taken throughout this time frame were only consistent with "moderate symptoms."  (Id. at 27.)  The ALJ gave great weight to the opinion of Sharon Flaherty, who completed the June 27, 2011 psychological consultation because it was not inconsistent with other medical evidence in the record and was

_____

[9] The ALJ did give great weight to Dr. Klausman's visual restrictions as those were based on contemporaneous treatment. (R. at 25.)

24

consistent with Plaintiff's Family Service treatment history and
Dr. Coffey's findings.  (Id. at 28-29.)  The ALJ gave little
weight to Dr. Miller's GAF score because it "may be based on the
claimant's allegations of paranoia, which have not been
consistently documented in the record" and it was "not supported
by the totality of the record."  (Id. at 30.)  The ALJ gave
little weight to the State Agency consultative examinations by
Dr. Biscardi and Dr. Lawrence because they were not consistent
with the totality of the record, the April 29, 2010 mental
status exam,[10] or Plaintiff's own testimony concerning her
ability to concentrate.  (Id. at 31.)

     The ALJ based this determination of the severity of
Plaintiff's mental impairment on a consideration of Plaintiff's
capacity to function: (1) the activity of daily living, (2)
social functioning, (3) concentration, persistence, or pace, and
(4) episodes of decompensation.  (Id. at 22-29.)  The ALJ
concluded based on the above medical evidence and assigned
weighting that Plaintiff had a moderate degree of limitation in
the activities of daily living; social functioning; and
concentration, persistent and pace.  Plaintiff was found to have

---

     [10] During this examination, Plaintiff was determined to be
logical, coherent and goal-directed, exhibiting fair judgment,
fair insight, and intact memory (both recent and remote.)

had one to two episodes of decompensation, but that these were not extended in nature.

Regarding the extent of Plaintiff's symptoms, the ALJ determined that Plaintiff has underlying medically determinable impairments that could reasonably be expected to result in the symptoms Plaintiff alleges.  The ALJ did have "reservations" about whether claimant's assertions of her symptoms were fully credible.  The ALJ identified four reasons to adversely view Plaintiff's credibility:

1. Plaintiff's inaccurate testimony regarding her incarceration history, (Id. at 33);

2. Plaintiff at times would describe her mood as "okay," and that she had no physical or medical system complaints, yet she alleges that she suffers severe physical impairments, (id.)

3. Plaintiff was found to have the severe impairment of COPD, yet she continues to use tobacco, (id.);

4. Plaintiff was found to be non-compliant with her treatment for a one month period around August 18, 2011, (id.)

In light of these credibility issues, the ALJ found that "the claimant's assertions concerning the severity of her impairments, and their impact on her ability to work, are only credible to the extent that they support of a finding of being able to perform light exertional work . . . ."  (Id. at 33.) Ultimately, the ALJ found that Plaintiff:

> [R]etains the [RFC] to perform the exertional demands of a full range of light work except for being able to stand and/or walk for two hours in an eight hour workday; can never climb ladders, ropes, and

26

scaffolds; can occasionally climb ramps and stairs,
balance, stoop, kneel, cough, and crawl; and only
occasional[ly] work at very close quarters and never
perform binocular vision; must avoid concentrated
exposure to extreme cold, extreme heat, wetness,
humidity, and environmental irritants; is limited to
unskilled tasks with goal oriented, rather than
production oriented tasks; no significant interaction
with the general public; no more than occasional
interaction with co-workers and supervisors; and
requires a stable workplace with few, if any, changes
of setting, processes or tools.

(Id. at 22.)

Having ascertained Plaintiff's RFC, the ALJ in Step Four
determined that Plaintiff had no past relevant work, thereby
ending the inquiry at that step.[11]   (Id. at 35.)  Finally, in
Step Five, the ALJ determined strict application of the Medical-
Vocational Rule 202.13 was not possible.[12]  Relying principally
on the testimony of the VE and the United States Department of
labor Dictionary of Occupational Titles, the ALJ determined that
Plaintiff could make an adjustment to work which exists in
significant numbers in the national economy.[13]  Accordingly,
based upon that finding, Plaintiff was found to be not disabled.

---

[11] When a plaintiff has no past relevant work, the burden
shifts to the ALJ to demonstrate the claimant's capacity to
perform work "available in significant numbers in the national
economy."  Russell v. Colvin, Civ. No. 13-5055, 2014 WL 4352186,
at *5 (D.N.J. Sep. 2, 2014) (internal quotation marks omitted).
[12] This rule, found in Appendix 2 to Subpart P of Part 404
(Medical-Vocational Guidelines), permits a finding of non-
disability by administrative notice.
[13] The ALJ noted the following available job: sorter, mail
clerk, and garment folder.  (R. at 36.)

## II.   <u>STANDARD OF REVIEW</u>

A reviewing court must uphold the Commissioner of Social Security's factual findings if they are supported by "substantial evidence," even if the court would have decided the inquiry differently. 42 U.S.C. §§ 405(g), 1383(c)(3); <u>Knepp v. Apfel</u>, 204 F.3d 78, 83 (3d Cir. 2000); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001). "Substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Cons. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)); <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999). Where the evidence is susceptible to "more than one rational interpretation, the Commissioner's conclusion must be upheld." <u>Ahearn v. Comm'r</u>, 165 F. App'x 212, 215 (3d Cir. 2006) (citing <u>Daring v. Heckler</u>, 727 F.2d 64, 70 (3d Cir. 1984); <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

If faced with conflicting evidence, however, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." <u>Ogden v. Bowen</u>, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing <u>Brewster v. Heckler</u>, 786 F.2d 581 (3d Cir. 1986)). Stated differently,

> [U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his

28

> decision is supported by evidence approaches an
> abdication of the court's duty to scrutinize the
> record as a whole to determine whether the conclusions
> reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting

Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th

Cir. 1977)) (internal quotations omitted); see also Guerrero v.

Comm'r, No. 05-1709, 2006 WL 1722356, at *3 (D.N.J. June 19,

2006) ("The ALJ's responsibility is to analyze all the evidence

and to provide adequate explanations when disregarding portions

of it."), aff'd, 249 F. App'x 289 (3d Cir. 2007).

While the Commissioner's decision need not discuss "every

tidbit of evidence included in the record," Hur v. Barnhart, 94

F. App'x 130, 133 (3d Cir. 2004), it must consider all pertinent

medical and non-medical evidence and "explain [any]

conciliations and rejections," Burnett v. Comm'r, 220 F.3d 112,

122 (3d Cir. 2000). See also Fargnoli, 247 F.3d at 42 ("Although

we do not expect the [administrative law judge] to make

reference to every relevant treatment note in a case where the

claimant . . . has voluminous medical records, we do expect the

ALJ, as the factfinder, to consider and evaluate the medical

evidence in the record consistent with his responsibilities

under the regulations and case law.").

In addition to the "substantial evidence" inquiry, the

reviewing court must also determine whether the ALJ applied the

correct legal standards. <u>See</u> <u>Friedberg v. Schweiker</u>, 721 F.2d 445, 447 (3d Cir. 1983); <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000). The court's review of legal issues is plenary. <u>Sykes</u>, 228 F.3d at 262 (citing <u>Schaudeck v. Comm'r</u>, 181 F.3d 429, 431 (3d Cir. 1999)).

### "Disability" Defined

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i-v). In <u>Plummer</u>, 186 F.3d at 428,

the Third Circuit described the Commissioner's inquiry at each

step of this analysis:

> In step one, the Commissioner must determine whether
> the claimant is currently engaging in substantial
> gainful activity. 20 C.F.R. § 1520(a). If a claimant
> is found to be engaged in substantial activity, the
> disability claim will be denied. Bowen v. Yuckert, 482
> U.S. 137, 140 (1987).
>
> In step two, the Commissioner must determine whether
> the claimant is suffering from a severe impairment. 20
> C.F.R. § 404.1520(c). If the claimant fails to show
> that [his] impairments are "severe," [he] is
> ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical
> evidence of the claimant's impairment to a list of
> impairments presumed severe enough to preclude any
> gainful work. 20 C.F.R. § 404.1520(d). If a claimant
> does not suffer from a listed impairment or its
> equivalent, the analysis proceeds to steps four and
> five.
>
> Step four requires the ALJ to consider whether the
> claimant retains the residual functional capacity to
> perform [his] past relevant work. 20 C.F.R.
> § 404.1520(d). The claimant bears the burden of
> demonstrating an inability to return to [his] past
> relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
> Cir. 1994). If the claimant is unable to resume [his]
> former occupation, the evaluation moves to the final
> step.
>
> At this [fifth] stage, the burden of production shifts
> to the Commissioner, who must demonstrate the claimant
> is capable of performing other available work in order
> to deny a claim of disability. 20 C.F.R.
> § 404.1520(f). The ALJ must show there are other jobs
> existing in significant numbers in the national
> economy which the claimant can perform, consistent
> with [his] medical impairments, age, education, past
> work experience, and residual functional capacity. The
> ALJ must analyze the cumulative effect of all the
> claimant's impairments in determining whether [he] is
> capable of performing work and is not disabled. See 20
> C.F.R. § 404.1523. The ALJ will often seek the

assistance of a vocational expert at this fifth step. See <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984).

## III. <u>ANALYSIS</u>

Plaintiff presents three issues for review by this Court. First, Plaintiff argues that the ALJ erred in reviewing a favorable decision of the Social Security Administration without providing notice to Plaintiff and without obtaining new evidence to cause him to question the decision of the Administration. (Pl.'s Br. at 1.)  Second, Plaintiff argues that ALJ erred in determining Plaintiff to be not credible, and in failing to address Plaintiff's testimony on her credibility.  (<u>Id.</u>)  Third, Plaintiff argues that the ALJ erred in rejecting the opinions and findings of "almost every evaluating source in the record" and failed to adequately evaluate medical opinions of record. (<u>Id.</u>)

### A. <u>Notice of Hearing</u>

Plaintiff's first argument is two-pronged.  Plaintiff argues initially that the hearings before the ALJ reached issues not before him because the amendment of the alleged onset date ended the inquiry.  Plaintiff then argues the supplemental hearing conducted on November 1, 2012 was done without notice to the Plaintiff.  Regarding the first prong, the requirements of § 416.1446 dictate that:

> [T]he issues before the administrative law judge
> include all the issues brought out in the initial,
> reconsidered or revised determination that were not
> decided in your favor.

20 C.F.R. § 416.1446(a).  Regarding the second, the regulation

goes on to state that the ALJ will notify an applicant and any

other parties if a new issue will be considered.  Id. ("However,

if evidence presented before or during the hearing causes the

administrative law judge to question a fully favorable

determination, he or she will notify you and will consider it an

issue at the hearing.")  "Notice of the time and place of the

hearing on any new issues will be given in the manner described

in § 416.1438, unless you have indicated in writing that you do

not wish to receive the notice."  20 C.F.R. § 416.1446(b)(2).

   The Court turns first to Plaintiff's argument that the ALJ

was not permitted to address any issue beyond amending

Plaintiff's alleged onset date because "Plaintiff's amendment of

her onset date at the initial hearing rendered the favorable

decision reached by the administration to be Fully Favorable."

(Pl.'s Br. at 1; R. at 53 (amending onset date).)  To the

contrary, the issue before the ALJ, pursuant to 20 C.F.R. §

416.1446(a), was Plaintiff's unfavorable denial of disability

benefits on June 29, 2011, where it was determined that

Plaintiff was not disabled on the merits.[14]  (R. at 150.)

Plaintiff's insistence that the ALJ exceeded the scope of the

hearing by reopening a favorable determination, (Pl.'s Rep. Br.

2), is undermined by the record and the decision of the ALJ.

(Id. at 19 (noting that the hearing was pursuant to a

reinstatement of the hearing Plaintiff requested to appeal her

June 29, 2011 denial of benefits), 37 ("It is not necessary to

consider the question of whether the unfavorable determination

made in conjunction with the prior application should be

reopened or revised."), 61 (noting that because Plaintiff had

elected to proceed on an amended onset date on her second

application there was "no need to consider the reopening issue"

at the July 23, 2012 hearing).)  The amendment of the alleged

onset date on Plaintiff's second application and the ALJ's

preliminary stated intent to rely upon the state agency's

substantive determination in assessing disability did not create

a fully favorable determination that Plaintiff was disabled.

Accordingly, issues related to Plaintiff's denial of SSI on the

---

[14] Under the heading "Issues the ALJ Will Consider," in the
notice of hearing mailed to Plaintiff in advance of the first
and second hearing, it reads, "The hearing concerns your
application of March 8, 2011, for Supplemental Security Income
(SSI) under section 1614(a)(3) of the Social Security Act . . .
.  The ALJ will consider whether you are disabled under section
1614(a)(2) of the Act."  (R. at 175.)  The notice goes on to
specifically describe the issues governing how the ALJ will
determine if he can find the Plaintiff to be disabled.  (R. at
176.)

merits, including Plaintiff's credibility, were properly before the ALJ.

Plaintiff's second argument is that the ALJ did not provide notice that Plaintiff's incarceration history would be an issue before him.  Specifically, Plaintiff argues that "calling the Plaintiff in for a supplemental hearing, and only then, at the time of the hearing providing the reason for reopening the claim falls far short of the requisite notice."[15]  (Pl.'s Rep. Br. at 3.)  Plaintiff argues that the Notice of Hearing Plaintiff received is a "form notice" and did not inform Plaintiff that her history of incarcerations would be an issue at the supplemental hearing on November 1, 2012.

Plaintiff's argument misses several key points.  The discussion of Plaintiff's incarceration history at the supplemental hearing was not a "new issue," as it had been discussed at the prior hearing.  (R. at 52, 54.)  Furthermore, at the conclusion of the initial hearing, the Court informed Plaintiff directly that if upon reviewing the record he identified issues that called into question his inclination to grant SSI benefits based on the state agency review, he would ask Plaintiff to return to give further testimony.  (Id. at 57

---

[15] The Court notes, again, that the procedural history does not indicate that the ALJ reopened a favorable determination, but rather adjudicated Plaintiff's second application for SSI benefits, which had been denied.

("I believe that I do have the authority to find disability
beginning that date, and it's my intention to do so unless we
review the case here and see that there's something that I'm
missing and that it requires further discussion or testimony, in
which case I'd have to ask you back in.");.  Finally, and
perhaps most importantly, the reason the supplemental hearing
was to continue the full hearing on the merits because, in light
of testimony the Plaintiff had already given, the ALJ felt it
necessary to expand the record of Plaintiff's claim for
disability benefits.  See 20 C.F.R. 416.1444 ("The [ALJ may]
reopen the hearing at any time before he or she mails a notice
of the decision in order to receive new and material
evidence.").

Plaintiff received notice of a supplemental hearing before
the ALJ, which stated that her application for SSI benefits
would be the issue before the ALJ.  (R. at 203.)  That is
precisely what the scope and nature of the hearing concerned.
(Id. at 60 ("[W]e'll be conducting another hearing and making a
decision on your case.  What I have before me is your
application for benefits . . . .  I'll make a new decision based
on the evidence before me.").  Accordingly, the ALJ committed no
error in reaching Plaintiff's second application on the merits.

36

B. **Plaintiff's Credibility**

Plaintiff challenges the ALJ's determination that she is not credible.  Under the relevant analysis, once an ALJ determines that a Plaintiff's medically determinable impairments could reasonably cause the alleged symptoms, "the ALJ must examine the intensity and persistence of the pain or symptoms as well as the degree to which it may limit the claimant's ability to work.  This requires the ALJ to decide the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Mellor-Milam v. Comm'r of Soc. Sec., Civ. No. 13-5732, 2014 WL 7405209, at *12 (D.N.J. Dec. 30, 2014).

While the ALJ is permitted to find portions of Plaintiff's testimony not credible, he is required to provide reasons for rejecting portions of Plaintiff's testimony which conflict with his findings. See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000) (stating an ALJ must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections").  The ALJ's credibility determination is a finding of fact and must be supported by "substantial evidence in the record." Bryant v. Astrue, Civ. No. 10-5771, 2012 WL 664829, at *10 (D.N.J. Feb. 29, 2012).  However, an ALJ's determination of credibility is accorded great deference.  See Blue Ridge Erectors v. Occupational Safety &

37

Health Review Comm'n, 261 Fed. Appx. 408, 410 (3d Cir. 2008)
(quoting St. George Warehouse, Inc. v. NLRD, 420 F.3d 294, 298
(3d Cir. 2005) ("[T]he ALJ's credibility determinations should
not be reversed unless inherently incredible or patently
unreasonable.")).

Plaintiff challenges essentially four foundations for
determinations of Plaintiff's credibility by the ALJ: (1) her
non-compliance with her treatment; (2) her use of tobacco
despite being diagnosed with COPD; (3) her inconsistent
testimony regarding her incarceration history; and (4) the
inconsistency between the severity of her allegations and her
medical records.  (R. at 33.)

### i. **Non-Compliance**

First, the ALJ determined that, "Mental health records from
Twin oaks Community Services for the period from May 26, 2011 to
May 24, 2012 indicated on August 18, 2011, that Ms. Lassiter had
been feeling unstable, but had been off her medications for over
a month . . . .  Such noncompliance with prescribed medication
adversely affects her credibility."  (Id. at 33.)  It is true
that, under many circumstances, non-compliance with treatment
may be grounds for an adverse credibility finding.  See, e.g.,
Timmons v. Colvin, 6 F. Supp. 3d 522, 534 (D. Del. Dec. 20,
2013) ("[P]laintiff's failure to follow recommendations by

physicians and/or to take medication as prescribed undermines

her credibility."). Nevertheless, as SSR 96-7P indicates,

> [T]he adjudicator must not draw any inferences about
> an individual's symptoms and their functional effects
> from a failure to seek or pursue regular medical
> treatment without first considering any explanations
> that the individual may provide, or other information
> in the case record, that may explain infrequent or
> irregular medical visits or failure to seek medical
> treatment.

Id.; see also Voorhees v. Colvin, Civ. No. 13-2583, 2015 WL

5785830, at *19 (M.D. Pa. Sep. 30, 2015) ("It is error to draw

adverse inferences from a claimant's failure to comply with

treatment without addressing whether the non-compliance was due

to her mental illness.").

The ALJ found that Plaintiff suffered from bipolar

disorder. Such a disorder, however, may specifically be the

cause of the non-compliance. See Voorhees, 2015 WL 5785830, at

*19 ("It is true that bipolar disorder is treatable by drugs.

But mental illness in general and bipolar disorder in particular

(in part because it may require a complex drug regimen to deal

with both the manic and the depressive phases of the disease)

may prevent the sufferer from taking her prescribed medicines or

otherwise submitting to treatment.") As such, the record is

devoid of any evidence that the ALJ accounted for the role of

Plaintiff's mental health diagnosis, if any, before making his

adverse credibility finding. As set forth above, it is improper

to draw adverse inferences from a claimant's failure to comply with treatment without addressing Plaintiff's reason for non-compliance with her treatment.

Plaintiff also argues that the ALJ erred because he considered non-compliance as a factor in Plaintiff's credibility, but did not discuss the fact that some of Plaintiff's non-compliance was attributable to the fact that she was in jail. (Pl.'s Br. at 20; R. at 33.) Factors such as Plaintiff's incarceration and her inability to afford medication were both offered at times as explanations for her non-compliance during Plaintiff's medical treatment. (R. at 650, 667.) However, the ALJ's credibility determination appears to turn exclusively on the 30-day period of non-compliance reported on August 18, 2011. (Id. at 33, 647.) This episode of non-compliance, while limited in nature, does not contain a note that it is attributable to Plaintiff's inability to afford her medications or her incarceration, but rather a vacation. As such, these explanations would not be germane to this isolated incident of non-compliance and did not need to be discussed.

### ii. Tobacco Use

The ALJ also negatively assessed Plaintiff's credibility because he found "the claimant to have a severe impairment due to chronic obstructive pulmonary disease (COPD), yet she was cited in this particular assessment of using tobacco, which weighs

negatively on her credibility." (Id. at 33.) It is unclear to the Court how Plaintiff's admission that she continues to use tobacco despite her diagnosis of COPD weighs adversely upon her credibility because it is not explained. The ALJ may have felt this evidenced non-compliance with her treatment regimen. See e.g., Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (holding that plaintiff's continued smoking while suffering from COPD amounts to a failure to follow a prescribed treatment regimen). On remand, the ALJ should set forth his explanations, which shall address Plaintiff's mental health.

### iii. Incarceration History

Plaintiff also argues that the ALJ improperly determined that Plaintiff was not credible because she gave inconsistent testimony regarding her incarceration history. (Pl.'s Br. at 16-17.) Plaintiff initially testified that she had not been incarcerated since April 12, 2010. (Id. at 54 ("Q: Now your counselor indicated that you have not been incarcerated at all since April 12th 2010, is that correct? A: Yes.").) When it appeared that answer was not accurate, (Id. at 251), the ALJ took further testimony from Plaintiff on the subject at the supplemental hearing, where Plaintiff explained that she had understood the question to be asking if she had been convicted

of a new crime.[16]   (Id. at 66.)   In making a finding that

Plaintiff was not credible, the ALJ noted that Plaintiff had

misrepresented whether she had been incarcerated, but did not

address Plaintiff's explanation that she did not understand what

the question about her incarceration was asking.   (Id. at 33.)

Plaintiff argues that the failure to address this testimony

renders the ALJ's credibility determination in error.

     This credibility determination requires further analysis to

be supported by substantial evidence.   While the Plaintiff's

inconsistent testimony could certainly give rise to an adverse

credibility finding, the ALJ nevertheless must consider evidence

that was conflicting, including Plaintiff's explanation that she

did not understand the question as it was asked to her.   The

"ALJ must present substantial evidence for his finding *and must*

*explain why certain evidence was rejected or deemed irrelevant*."

Bryant, 2012 WL 664829, at *11 (emphasis added).   Accordingly,

for this reason, too, the Court remands the matter for further

discussion of whether Plaintiff's purported explanation for her

answer regarding her incarceration history affects her

credibility determination.

---

[16] Plaintiff was incarcerated from February 9, 2012 to March
3, 2012.  Plaintiff's incarceration arose from a contempt charge
for failure to pay fines for an offense that occurred before
April 12, 2010.  (R. at 66, 251.).  Plaintiff's fines were
vacated to jail time.  (R. at 252.)

### iv.  **Medical Evidence**

With regard to credibility, Plaintiff last argues that the
ALJ erred in discounting her credibility because she described
her current physical health as "okay" and that she had no
physical or medical system complaints on April 29, 2010, yet she
made allegations of severe physical impairments throughout that
time.  (Pl.'s Br. at 19-20.)  Plaintiff argues that this Initial
Comprehensive Psychiatric Assessment in which Plaintiff remarked
positively or neutrally on her physical health contains no
evidence that a physical evaluation was conducted.  (Id.)

An ALJ may premise an adverse credibility finding upon
inconsistent descriptions of the severity of Plaintiff's
symptoms.  Mellor-Milam v. Comm'r of Soc. Sec., Civ. No. 13-
5732, 2014 WL 7405209, at *13 (D.N.J. Dec. 30, 2014) (explaining
that "one strong indication of the credibility of an
individual's statements is their consistency, both internally
and with other information in the case record" and upholding
credibility determination where Plaintiff's description of her
ability to kneel in the hearing did not match the Disability
Function Report).  The ALJ determined that Plaintiff's
description of her physical health as "okay," despite her
allegations that several physical ailments limit her ability to
work, undermined her credibility.  (R. at 293 (listing
hypertension, ganglion cysts, goiter and foot injury as ailments

43

that prevent her from working).)  The ALJ is permitted to discount medical opinions that are inconsistent with the record. Here, the ALJ did so, while thoroughly explaining his reasoning.

While the ALJ did not err in this particular facet of the credibility analysis, as discussed above, the remainder of the credibility analysis is not well-supported.  Accordingly, the Court remands for a further discussion of the credibility of Plaintiff's allegations of the extent of her symptoms, and as necessary, a re-analysis of Plaintiff's RFC.

## C. **Medical Records**

Finally, Plaintiff contends that the ALJ erred in his evaluation of the medical records.  Plaintiff contends the ALJ disregarded or improperly weighted the records of six sources, which are addressed in turn below.  As noted above, in evaluating medical evidence, the ALJ must consider all relevant evidence when assessing a claimant's RFC and provide a clear and satisfactory explication of the basis for that assessment, but need not discuss every relevant treatment note in so doing. Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001).  In evaluating the weight to be given medical opinions, ALJ's are to look to: (1) examining relationship, (2) treatment

relationship,[17] (3) supportability, (4) consistency, (5) specialization, (6) other factors.[18]  20 C.F.R. § 416.927.

### i.  **Family Service**

Plaintiff first claims that "it was an error [for] the ALJ to accord Ms. Middlebrook's GAF score little weight[.]"  (Pl.'s Br. at 23.)  Ms. Middlebrooks is not a treating physician, but rather a nurse practitioner.  Her opinion "cannot establish the existence of a medically determinable impairment . . . [but] may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p. Here, the ALJ afforded little weight both to the GAF opinion reach by Ms. Middlebrooks on April 29, 2010 and the examination report completed on March 29, 2011.  (R. at 34.)

The ALJ gave little weight to the GAF score because it was inconsistent with the totality of the record, as contemporaneous evaluations in April 2010 and 2011 by the State Agency psychological consults found the Plaintiff to have only moderate symptoms.  (Id. at 477, 557-62.)  Moreover, a slew of subsequent

---

[17] This factor permits the granting of controlling weight to treating sources in certain instances.  20 C.F.R. § 416.927(c)(2).  In this case, Plaintiff does not contend that any opinion should be entitled to controlling weight, but rather all six opinions were entitled to "greater than 'little' weight based on the factors."  (Pl.'s Rep. Br. at 8.)

[18] This is a catch-all category for "any factors [the claimant] brings to [the Administration's] attention, or of which [the Administration] is aware."  20 C.F.R. § 416.927(c)(6).

treatment records for Plaintiff place her GAF score much higher. (Id. at 635, 638, 641, 644, 650, 655, 658).  Plaintiff's argument that the failure to consider the records of Plaintiff's treatment after her suicide attempt, during which she was admitted with a GAF of 25 is not availing because she was released after that visit with a GAF of 55.  (Id. at 519.)  In light of the inconsistency of Ms. Middlebrook's GAF score with others taken, it was not in error for the ALJ to afford this little weight.  The ALJ adequately explained the reason for this weighting.

### ii.  **Dr. Coffey**

Plaintiff contends that the ALJ failed to take into account that Dr. Coffey's opinion showing Plaintiff possessed impaired mental pace, presence and social interaction, nor did Plaintiff appear to "be emotionally stable to be able to maintain socially appropriate behavior."  (Pl.'s Br. at 24 (quoting R. at 560).) Plaintiff argues that the ALJ "ignored Dr. Coffey's examination findings and conclusions and instead referenced only Dr. Coffey's GAF assessment of 55."  (Id.)

Plaintiff's characterization of the ALJ's treatment of Dr. Coffey's evaluation is inaccurate.  The ALJ's opinion discusses Dr. Coffey's report in depth, including not only Plaintiff's GAF scores, but also findings that Plaintiff had marginal insight, anxiety, and limited concentration.  (R. at 29.)  Contrary to

Plaintiff's argument, the ALJ also explicitly discussed Dr. Coffey's determination that Plaintiff had impaired mental pace, persistence and social interaction, finding that these would not prevent employment in a low-contact social environment, particularly where Dr. Coffey was able to relate and interact with her appropriately.  (Id.)  Moreover, the ALJ explicitly reconciled his finding against Dr. Coffey's observation that Plaintiff could not maintain socially appropriate behavior, noting that Plaintiff's agitation and knee-bouncing also did not prevent her from working in a low-contact environment.  (Id.) In so doing, the ALJ appropriately considered the medical evidence.

That said, Plaintiff's argument that "the opinions of Dr. Coffey . . . should have been accorded substantial weight" has more merit.  Indeed, the Court is unable to discern the weight that was given to Dr. Coffey's opinion.  (R. at 28-29.) Accordingly, on remand the ALJ should also make clear the amount of weight being assigned to Dr. Coffey's finding and, if necessary, adjust the RFC finding.  See Taylor v. Comm'r of Soc. Sec., 83 F. Supp. 3d. 625, 628 (D.N.J. Jan. 15, 2015) (remanding case where the court was "unable to say what weight the ALJ gave the medical opinions at issue" including the opinion of a psychological consultative examiner).

### iii. **Dr. Miller**

The Plaintiff next contends that the ALJ failed to appropriately evaluate the consultative psychological examination of Dr. Miller conducted on November 15, 2011.  In his opinion, the ALJ assigned little weight to the "GAF opinion" by Dr. Miller because it "appear[ed] lower than the observations made in the examination and that such a rating may be based on the claimant's allegations of paranoia, which have not been consistently documented in the record."  (R. at 30.)  Plaintiff argues that not only is the GAF score consistent with other medical evidence in the record, but that Dr. Miller makes no reference to the fact that her low GAF score is predicated on the Plaintiff's allegations of paranoia.  (Pl.'s Br. at 26.)

"An ALJ 'may not make speculative inferences from medical reports' and cannot make decisions about medical evidence based on 'his or her own credibility judgments, speculation, or lay opinion.'" George-Jellison v. Comm'r of Soc. Sec., Civ. No. 08-0359, 2009 WL 331418, at *3 (D.N.J. Feb. 10, 2009) (quoting Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000)).  Here, the GAF score makes no explicit references to Plaintiff's complaints of paranoia, and, indeed, comes at the end of a lengthy explanation of Plaintiff's mental status which included direct observations that Plaintiff had trouble with basic problem solving, impressed as being of below-average

48

intelligence, had problems with short-term memory, required clarifications to carry on a basic conversation, and displayed limitations in receptive language, insight and judgment. (R. at 564.) Because the ALJ speculated as to the source of Dr. Miller's GAF score, the weight assigned to it is not reliable. Accordingly, on remand, the ALJ shall reconsider the weighting of this opinion consistent with the above, and adjust the RFC finding as needed.[19]

### iv. **Drs. Biscardi and Lawrence**

Plaintiff also takes issue with the little weight assigned by the ALJ to the opinions of Drs. Biscardi and Lawrence. The ALJ assigned little weight to these opinions because the rated limitations in memory and concentration were not consistent with Plaintiff's claim of being able to "focus for about an hour when watching television" and an April 29, 2010 evaluation which

---

[19] The Court does not suggest that Dr. Miller's opinion is required to be weighted more heavily. Indeed, it appears inconsistent with psychological exams conducted both the month before and after during which Plaintiff was assessed with a GAF score of 59. (R. at 658, 661.) Plaintiff's argument that it is consistent with her suicide attempt in February of 2012 is incorrect because the medical record indicates Plaintiff attempted suicide in February of 2011. Furthermore, Plaintiff was discharged at that time with a GAF score of 55. Drs. Coffey and Brown both assessed Plaintiff's GAF score more favorably than Dr. Miller, despite Plaintiff's claim otherwise. Nevertheless, the job of this Court is not to re-weigh the evidence of the fact-finder. See Monastro v. Comm'r of Soc. Sec., 2015 WL 1924440, at *2 (D.N.J. Apr. 28, 2015) ("The reviewing court is not empowered to weigh the evidence or substitute its conclusions . . . .").

found that Plaintiff was logical, coherent, and goal oriented, with fair general judgment and insight, intact memory, average intelligence, unimpaired alertness and sensorium, and full orientation. (R. at 501-14.)

The Court finds that the ALJ did not err in assigning little weight. The ALJ's reason—that the concentration and memory findings were inconsistent with other medical evidence in the record—is sufficiently explained. The ALJ pointed to records, including Plaintiff's testimony about her ability to concentrate in her everyday life and the April 29, 2010 examination which appears to paint a different picture than the evaluations of Drs. Biscardi and Lawrence. (<u>Id.</u> at 31.) Contrary to Plaintiff's argument, the ALJ explained why he afforded less weight to Plaintiff's position. Even if this Court would have weighed the evidence differently, the Court may not do so.

**v.   <u>Dr. Brown</u>**

Finally, Plaintiff argues that the ALJ failed to discuss the consultative report of Dr. Brown "anywhere in the decision." (Pl.'s Br. at 28-29.) Indeed, Plaintiff is correct and the opinion does not anywhere reference or weigh the medical evidence provided by Dr. Brown, despite the opinion being an exhibit before him. (R. at 44.) Even though that opinion was prior to the alleged onset date, and for that reason could have

been discounted, see McKean v. Colvin, Civ. No. 13-cv-2585, 2015
WL 1201388, at *5 (M.D. Pa. Mar. 16, 2015), the ALJ was still
required to consider it and required to explain why he rejected
it, if he did.  Id. ("[T]he mere fact that evidence exists prior
to disability onset does not automatically mean that such
evidence is not relevant, nor does it relieve an ALJ of the duty
to explain why evidence predating the onset date would not be
afforded substantial weight.").  As such, on remand, the ALJ
will be required to address Dr. Brown's opinion.

**IV.   CONCLUSION**

        Dealing with voluminous medical records, the ALJ engaged in
a long and detailed analysis in arriving at his findings.
Nevertheless, the ALJ's failure to set forth certain
explanations underpinning those findings, as described above,
requires remand.  While the ALJ may ultimately reach the same
conclusion, the above-discussed reasoning behind that conclusion
is necessary.  Accordingly, the Court **VACATES** the decision of
the ALJ and **REMANDS** for consideration consistent with this
Opinion.


DATED: December 23, 2015

                              s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE